## DECLARATION OF STEVEN L. HARKNESS

I, Steven L. Harkness, declare and state:

1. I am over the age of 18.

2. The facts herein are based upon my personal knowledge.

3. At all relevant times, I was a General Adjuster employed by Liberty Mutual Insurance Company ("Liberty Mutual"). At all relevant times, I worked out of my home office located in the vicinity of Phoenix, Arizona.

4. At all relevant times prior to the service of this lawsuit upon Liberty Mutual, I was the claims adjuster for the June 5, 2015 fire claim made by Plaintiff American Property – Management Corporation. The claim was assigned claim number 941527300. I am familiar with the documents in the claim file for this claim.

5. Plaintiff's claim was made pursuant to an RM Select policy of insurance, Policy No. YU2-L9L-441-454-085, effective 03/21/15 to 03/21/16, that Liberty Mutual Fire Insurance Company issued to named insured American Property – Management Company in California and which provided property coverage for properties located in California, Arizona, Ohio, and Washington, including Esplendor, subject to the provisions of the Policy.

6. Liberty Mutual paid Plaintiff partial payments beginning July 2015, with the full Actual Cash Value (ACV) of $1,801,694.03 paid by June 16, 2016, as is documented in the May 18, 2017 letter from Jeffrey Gesell, Esq. to Robert Ryan, Esq. and Josh Scott (Greenspan), Plaintiff's attorneys and agent. A true and correct copy of the Geselle letter is attached hereto as **Exhibit A**. ACV means replacement cost less depreciation. In order to receive Replacement Cost Value (RCV), the Policy requires repairs to be performed within two years of the loss. As of my May 10, 2017 inspection of the property at issue, not only had repairs not been started, but plans for those repairs had yet to be submitted to the Santa Cruz County Building Department in Rio Rico, Arizona. Based

1


EXHIBIT 6

upon Plaintiff's failure to repair within two years of the loss, Plaintiff would not receive the depreciation amount, or RCV. Liberty Mutual did not agree to toll the two-year requirement, and Plaintiff seeks an approximate $600,000.00 in depreciation in this lawsuit. Please refer to the May 3, 2017 letter from Robert Ryan, Esq., Plaintiff's counsel, a true and correct copy of which is attached hereto as **Exhibit B.**

7. Based upon a revised March 2017 bid from Belfor Property Restoration, Plaintiff seeks five to six million dollars for repairs to the building loss as a result of the fire. Liberty Mutual valued the repairs at $2.4 million in June 2016.

EXECUTED THIS 24th day of July, 2017, in Chandler, Arizona.

I declare under penalty of perjury, that the foregoing is true and correct.

_____
Steven L. Harkness



**JONES TURNER**
ATTORNEYS

JEFFREY N. GESELL
jgesell@jonesturner.com

May 18, 2017

*Via E-mail and U.S. Mail*

Robert D. Ryan
Law Offices of Robert D. Ryan, P.L.C.
343 W. Roosevelt Street, Ste. 220
Phoenix, Arizona 85003
rob@robertdryan.com

Josh Scott
Executive General Adjuster
The Greenspan Co./Adjusters International
14614 N. Kierland Blvd N-140
Scottsdale Arizona 85254
josh@greenspan-ai.com

Re:  Insured:           American Property Management Corp.
     Loss Location:     1069 Camino Caralampi, Rio Rico, AZ 85648
     Loss Description:  Fire
     Date of Loss:      6/5/2015
     Underwriting Co.:  Liberty Mutual Fire Insurance Company
     Claim Number:      941527300
     Policy Number:     YU2-L9L-441454-085

Dear Messrs. Ryan and Scott:

I write on behalf of Liberty Mutual Fire Insurance Company ("Liberty Mutual") in response to Mr. Ryan's May 3, 2017 letter regarding the claim submitted by American Property Management Corp. ("APMC") concerning damage to the Esplendor Resort in Rio Rico, Arizona attributed to the fire that occurred on or about June 5, 2015. Please be advised that I and my firm have been retained by Liberty Mutual to provide assistance with regard to the above-referenced claim.

Your May 3 letter proposes that the parties enter into a tolling agreement that would allow APMC "one year to rebuild upon reaching an agreement as to the value of the building facilities claim." For the reasons set forth below, Liberty Mutual respectfully declines your proposal in that respect.


EXHIBIT A

Messrs. Ryan and Scott
May 18, 2017
Page 2

Liberty Mutual issued policy no. YU2-L9L-441454-085 to APMC, effective March 1, 2015 to March 1, 2016 ("the Policy"). As Mr. Ryan notes in his May 3 letter, the Valuations section of the Policy (form RM1005 02-11) contains a Replacement Cost provision that states, in pertinent part, as follows:

> A. **Replacement Cost**
>
> 1. Loss or damage to **covered property** will be valued at the time and place of the loss at **replacement cost** unless otherwise indicated in B. and C. below or by other forms or endorsements attached to this policy.
>
> 2. **We** will not pay **replacement cost** until the lost or damaged property is actually repaired or replaced. If repairs or replacement are not made within <u>two (2) years</u> after the date of the physical loss **we** will pay only the **actual cash value** amount.
>
> * * *
>
> b. **We** will not pay for any increase in cost due to **your** failure to use reasonable speed to repair, rebuild or replace the damaged property.

(Emphasis in original.)[1]

Mr. Ryan's letter indicates that APMC will be unable to comply with the two-year replacement deadline set forth in the above-quoted provision. Mr. Ryan contends that Liberty Mutual has "interfered with [APMC's] ability" to comply with that deadline, citing *Rockford Mut. Ins. Co. v. Pirtle*, 911 N.E.2d 60 (Ind. Ct. App. 2009) in support of his contention.

We note at the outset that *Rockford* is factually inapposite and that the approach taken in *Rockford* by the Indiana Court of Appeals has been rejected by other courts. *See, e.g., D & S Realty, Inc. v. Markel Ins. Co.*, 284 Neb. 1, 21, 816 N.W.2d 1, 15-16 (2012); *Stephens & Stephens XII, LLC v. Fireman's Fund Ins. Co.*, 231 Cal. App. 4th 1131, 1143-48, 180 Cal. Rptr. 3d 683, 694-97 (2014), *as modified on denial of reh'g* (Dec. 17, 2014).

---

[1] The Policy Definitions (form RM1007 02-11) state, in pertinent part, as follows:

> B. **Actual cash value** means **replacement cost** less deduction for depreciation
>
> * * *
>
> KK. **Replacement cost** means the cost to replace **covered property**:
>
> 1. With new materials of like kind and quality and used for the same purpose; and
>
> 2. At the location where the loss happened.
>
> But **replacement cost** excludes any increased cost of repair or reconstruction by reason of any law or ordinance regulating construction, repair or use.

Messrs. Ryan and Scott
May 18, 2017
Page 3

The court in *Rockford* noted that the insurer only offered to make an actual cash value ("ACV") payment in the amount of $69,874.62 after delays in the payment of insurance proceeds had already caused the insured such financial distress that he was unable to meet his obligations under the mortgage, leading to commencement of foreclosure proceedings and condemnation of the property by the city. *Rockford*, 911 N.E.2d at 66. Here, on the other hand, Liberty Mutual issued an advance payment to APMC under the building coverage in the amount of $250,000 on July 13, 2015, just 38 days after the loss. By March 11, 2016, Liberty Mutual had already issued advance payments to APMC under the building coverage totaling $1,000,000. By June 16, 2016 – nearly a full year before the expiration of the two-year deadline set forth in the Policy's Replacement Cost provision – Liberty Mutual had paid APMC the full ACV of $1,801,694.03. That amount included $204,778.12 for architectural and engineering fees. Accordingly, the factual scenario presented in *Rockford* bears little resemblance to the subject claim.

Moreover, the approach taken in *Rockford* by the Indiana Court of Appeals is unlikely to be adopted by Arizona courts. In support of its decision, the court in *Rockford* cited Couch on Insurance for the following observation: "Even where actual replacement is mandated, compliance may be excused by the insurer's actions. The insurer's failure to advance the necessary funds to rebuild may have this effect." *Rockford*, 911 N.E.2d at 65 (Ind. Ct. App. 2009), *citing* Couch on Insurance (3d ed.1995) § 176:59 at 176-52. That observation in Couch on Insurance is supported, in turn, with reference to two cases, *McCahill v. Commercial Union Ins. Co.*, 179 Mich. App. 761, 446 N.W.2d 579 (1989) and *Reese v. N. Ins. Co. of N.Y.*, 207 Pa. Super. 19, 215 A.2d 266 (1965). 12 Couch on Ins. § 176:59. The reasoning of the courts in *McCahill* and *Reese* has been either limited or expressly criticized by courts that have examined those cases. The court in *McCahill* found that the insured had established a prima facie case of "extreme and outrageous conduct" by the insurer[2] – and Michigan cases have declined to extend the application of *McCahill* to cases that do not involve such "extreme and outrageous conduct." *See, Smith v. Michigan Basic Prop. Ins. Ass'n*, 441 Mich. 181, 190, 490 N.W.2d 864, 867 (1992). The Superior Court of Pennsylvania in *Reese*, reviewing policy provisions that differ greatly from those contained in Liberty Mutual's policy,[3] held that "the insured is entitled to utilize the replacement cost provision of the policy without actually rebuilding." *Reese*, 207 Pa. Super. at 25, 215 A.2d at 269. Courts in other jurisdictions have noted that *Reese*'s holding in that regard "has . . . been routinely criticized." *Burchett v. Kansas Mut. Ins. Co.*, 30 Kan. App. 2d 826, 829, 48 P.3d 1290, 1292 (2002); *see also, Higgins v. Ins. Co. of N. Am.*, 256 Or. 151, 167, 469 P.2d 766, 774 (1970) ("We think *Reese* . . . was wrongly decided."); *Hess v. N. Pac. Ins. Co.*, 122 Wash. 2d 180, 190-91, 859 P.2d 586, 591–92 (1993). Accordingly, the conceptual basis for the court's decision in *Rockford* relies on authorities that are either questionable or limited to very specific – and here, inapposite – factual scenarios.

---

[2]  That "extreme and outrageous conduct" included, among other things, the insurer's agents' trespassing on the insured's property on two occasions, altering the fire scene without the insured's knowledge or consent and calling the insured at or near midnight to demand that the insured provide a proof of loss statement over the telephone. *McCahill v. Commercial Union Ins. Co.*, 179 Mich. App. 761, 769-70, 446 N.W.2d 579, 583 (1989).

[3]  As other courts have recognized, "there was no clause [in the policy at issue in *Reese*] providing for the payment of cash value only until repair or replacement was completed." *Hess v. N. Pac. Ins. Co.*, 122 Wash. 2d 180, 190, 859 P.2d 586, 591 (1993)

Couch on Insurance goes on to explain that "the policy may expressly mandate rebuilding as a condition to recovery" and that policy provisions setting forth such requirements have been enforced. 12 Couch on Ins. § 176:60. Courts have similarly enforced policy provisions establishing a deadline by which insureds must complete repairs in order to entitle themselves to recovery of replacement cost value ("RCV"). For example, in *Hoffman v. Foremost Signature Ins. Co.*, 989 F. Supp. 2d 1070 (D. Or. 2013), the Oregon District Court held that the insured was precluded from recovering RCV coverage because she failed to replace her dwelling within 365 days – since the policy required actual replacement of the insured's home with a new dwelling of like kind and quality within 365 days following its loss from a fire in order for the insured to obtain RCV coverage. The court in *Hoffman* held, moreover, that "ongoing negotiations between the parties do not make application of the replacement provision inequitable." *Hoffman*, 989 F. Supp. 2d at 1081-83. That is to say, the running of the time period was not tolled by negotiations between the parties regarding the value of RCV repairs. *Id.*, 989 F. Supp. 2d at 1082.

Likewise, in *Lytle v. Country Mut. Ins. Co.*, 2015 IL App (1st) 142169, 397 Ill. Dec. 246, 41 N.E.3d 657 (App. Ct. 1st Dist. 2015), an insured who failed to make any repairs or replacements within one year was held unentitled to recover RCV. The policy provision at issue in *Lytle* stated: "You may choose, at your election, to accept actual cash value instead of replacement cost. If you do so, you will have one year from the date of the loss to repair or replace the damaged property and request the difference between actual cash value and replacement cost." *Lytle*, 2015 IL App (1st) 142169, at ¶ 19, 41 N.E.3d at 661. The court explained:

> Here, it is undisputed that Lytle has been paid the actual cash value of the damaged property at the time of the loss and has not repaired or replaced the property. Moreover, it is undisputed that the policy contains a standard depreciation holdback loss settlement provision that states Country Mutual will not pay more than actual cash value until the actual repair or replacement is complete. Accordingly, Lytle is not entitled to reimbursement for the depreciation holdback because he did not incur that pecuniary loss.

*Id.*, 2015 IL App (1st) 142169, at ¶ 24, 41 N.E.3d at 662.

Courts that have excused insureds from complying with policy provisions requiring repair or replacement within a specified period of time have generally done so where a dispute between the insurer and insured over *coverage* has caused delays in rebuilding. For example, in *Stephens & Stephens XII, LLC v. Fireman's Fund Insurance Co.*, 231 Cal. App. 4th 1131, 180 Cal. Rptr. 3d 683 (1st Dist. 2014), *as modified on denial of reh'g*, (Dec. 17, 2014), the court held that the delays caused by the insurer's *denial of* an insured commercial building owner's damage claim materially hindered the owner's ability to plan for the property such that the delay excused the building owner from complying with a policy requirement that the damage be repaired "as soon as reasonably possible after the loss or damage" in order to obtain RCV. The court in *Stephens & Stephens XII* noted that Fireman's Fund ultimately *denied* coverage – nearly five years after the incident and barely a month before trial – on the grounds that Stephens XII had concealed and misrepresented material information during the insurance investigation. *Stephens & Stephens XII*, 231 Cal. App. 4th at 1136, 180 Cal. Rptr. 3d at 688.

Messrs. Ryan and Scott
May 18, 2017
Page 5

The court held as follows:

> *When an insurer's decision to **decline** coverage materially hinders an insured from repairing damaged property, procedural obstacles to obtaining the replacement cost value should be excused.* If coverage is ultimately resolved in favor of the insured, the insured should remain eligible to receive replacement cost, but only so long as the insured complies with other applicable policy terms, such as a repair requirement. In other words, a coverage dispute should not give the insured a benefit under the policy it never had in the absence of the dispute – such as the right to receive the replacement cost without actually repairing the damage.
>
> \* \* \*
>
> Stephens XII nonetheless remains entitled to a judgment awarding replacement cost consistent with the repair requirement if it actually completes the repairs "as soon as reasonably possible" after the judgment becomes final.

*Stephens & Stephens XII*, 231 Cal. App. 4th at 1144-46, 180 Cal. Rptr. 3d at 695-96 (emphasis added).

Here, on the other hand, Liberty Mutual has not denied APMC's claim for building coverage. On the contrary, Liberty Mutual made the first $250,000 advance payment to APMC under the building coverage within 38 days after the loss. The full ACV of $1,801,694.03 was paid to APMC on June 16, 2016 – nearly a full year before the expiration of the two-year deadline set forth in the Policy's "Replacement Cost" provision. Liberty Mutual and APMC have engaged in discussions regarding the appropriate amount of ACV and/or RCV repairs. As the court in *Hoffman* explained, however, such discussions do not toll or suspend the running of deadlines for completing repair or replacement in accordance with policy requirements. We note that in May 2016, Liberty Mutual reached an agreed-upon cost of repair with Jacobson Custom Homes/Commercial Construction ("Jacobson") for the fire damage to the building. As Liberty Mutual's Steven Harkness explained in his May 22, 2016 letter, the Jacobson bid was developed with the use of local sub-contractors, many of whom have worked on the fire damaged building prior to this fire loss.

Moreover, it does not appear that APMC has been diligent in making repairs or replacement. In fact, it does not appear that APMC has been diligent even in making *preparations* for eventual repairs or replacement. Mr. Harkness inspected the property on May 10, 2017 and learned that no repairs whatsoever have been undertaken with regard to the areas of the Esplendor Resort that were damaged as a result of the June 5, 2015 fire. Following his inspection, Mr. Harkness visited the Santa Cruz County Building Department and learned that no plans for such repairs have been submitted for review.

As you are aware, Mr. Scott advised on December 16, 2016 that "the insured is still currently in the planning stages of repair and awaits a set of completed plans for obtaining construction

permits." Mr. Scott's December 16, 2016 e-mail stated that "[i]t's our understanding the plans should be completed in the very near future." Five months have now passed since Mr. Scott's e-mail and no plans have been submitted.

Mr. Ryan's letter acknowledges that Liberty Mutual has placed APMC on notice of the deadline set forth in the policy's Replacement Cost provision. In fact, Mr. Harkness advised APMC of the deadline – and quoted the pertinent provision – in his May 22, 2016 letter to Mr. Scott. Mr. Ryan contends that Liberty Mutual delayed the adjustment process by sending the "scope out for 'competitive bids'," by advocating the reuse of an electrical system that was, according to APMC, damaged by water from the fire-suppression effort and by purportedly refusing "to acknowledge code compliance issues that were signed off on by government officials." Liberty Mutual disputes those contentions – and has previously addressed them in prior correspondence. As Mr. Harkness explained in his letters of May 22 and June 9, 2016, any delays in the adjustment process are attributable to the Greenspan Company's initial direction that ongoing mitigation work cease, which resulted in additional damage to the Esplendor Resort. As Mr. Harkness' May 22, 2016 letter also sets forth, additional delays were caused by inappropriate activities on the part of APMC's representatives during the development of the bids. Regardless, Mr. Ryan's letter fails to explain why APMC has, to this date, still not submitted plans for review – <u>despite having received the full $1,801,694.03 ACV payment by June 2016</u> and despite having been advised of the two-year deadline by May 2016, at the latest.

In light of APMC's failure to diligently proceed with repairs and replacements, Liberty Mutual respectfully declines to enter into the tolling agreement proposed by APMC.

Please do not hesitate to contact me with any questions you may have.

Very truly yours,<br>
JONES TURNER, LLP<br>
<br>
Jeffrey N. Gesell

JNG:gm

# RdR/

343 W. Roosevelt Street
Suite 220
Phoenix, Arizona 85003
(602) 256-2333 Telephone
(602) 256-2334 Facsimile

\* Mr. Ryan Licensed in Arizona, Nevada &
New Mexico

# The Law Offices of
# Robert D. Ryan, P.L.C.

Writer's e-mail: rob@robertdryan.com

May 3, 2017

*Sent Via E-Mail & Regular Mail:* [Steven.Harkness@LibertyMutual.com]

Steven L. Harkness
Liberty Mutual Insurance
P.O. Box 7215
London, KY 40742-7215

Re:  Insured:         **American Property Management Corp.**
     Claim No.:       **X 80A-009607 (fire loss)**
     DOL:             **6/05/15**
     Loss Location:   **Esplendor Resort, Rio Rico, Arizona**

Dear Mr. Harkness:

I have been retained to represent the interests of American Property Management Corporation ("APMC") with respect to the above-referenced claim. The purpose of this letter is to demand that Liberty Mutual provide APMC with an extension of time to rebuild its damaged facilities <u>so that it can recoup the depreciation holdback relevant to its replacement cost coverages.</u>

I know that Liberty Mutual has taken the position in correspondence past that APMC was required to rebuild within two years of the date of loss to recoup the depreciation hold back, referencing the following provisions of its policy:

  A. Replacement Cost

   1. Loss or damage to covered property will be valued at the time and place of the loss at replacement cost unless otherwise indicated in B. and C. below or by other forms or endorsements attached to this policy.

   2. We will not pay replacement cost until the lost or damaged property is actually repaired or replaced. If repairs or replacement are not made within two (2) years after the date of the physical loss we will pay only the actual cash value amount.



EXHIBIT B

Ltr to Harkness--Retention 2yr Rebuilding Period.pdf

Having reviewed the adjustment history of this loss, it is hard to imagine a more inequitable position than Liberty Mutual continuing to demand compliance with the foregoing deadline.

There is no dispute that even with the most diligent and efficient of adjusting efforts, it would have required APMC some 10 to 12 months to rebuild from the fire. Such a timeline is muddled and/or extended all the more after considering the substantial code requirements and fire safety procedures that had to be implemented in order to rebuild.

When one then considers the actual manner by which Liberty Mutual has adjusted this loss, it has been flat impossible for APMC to rebuild within two years of the June 2015 date of loss. Consider this; Liberty Mutual did not even provide a scope of loss on the rebuilding effort until November 23, 2015. This was nearly *six months after the fire occurred and more than four months after Greenspan had submitted its rebuilding estimate* in the approximate amount of $3.5 million in mid-July 2015. One must also consider that when Liberty Mutual finally provided its November 2015 scope of work, it had not attached a single price point to the work described. To the contrary, it sought to send the scope out for "competitive" bids in order to set the value of the loss. The carrier had thus wasted through some six months of the adjusting process trying to whittle down a proposed scope of loss, as opposed to getting on with its obligation of valuing the claim and making a corresponding payment. With no agreed scope and no agreed payment, it was not possible for APMC to commence repairs.

The claim then dragged an additional six months through a bid process that found Liberty Mutual stalwart at nearly every turn. We see that the carrier tried to advocate reusing an electrical system that was visibly and patently damaged by water from the fire-suppression effort; buried from view one of the competitive bids it had received from ATI in excess of $4 million; and flat refused to acknowledge code compliance issues that were signed off by governmental officials. Indeed, Liberty Mutual did not place any value on the building loss until June 16, 2016, in the approximate amount of $2.4 million. This was *more than a year after the fire had occurred*.

As the claim slogged from there, Liberty Mutual still refused to acknowledge code compliance issues, and its building valuations were nowhere close to Greenspan or Belfor's estimating. Without a financial commitment or Liberty Mutual's agreement on the applicability of code issues, it has remained impossible for APMC to rebuild. After further conferring with county officials regarding code mandates, Belfor just recently recast its reconstruction estimating in papers sent to you a few days ago. Its bid is now in excess of $5 million. Accordingly, as the two-year anniversary of the date of loss approaches in about a month, the parties are still millions of dollars apart in terms of the costs of rebuilding, and Liberty Mutual still ignores code mandates again confirmed as applicable by the local building authority.

Time-Sensitive Demand for Relief

As referenced, the purpose of this letter is to demand relief from Liberty Mutual in terms of its position that APMC complete its rebuilding effort by June 5, 2017 in order to recoup withheld depreciation. Reflecting on the carrier's own estimating, the depreciation hold back approximates $600,000 at present. A cursory examination of the adjusting process reveals that APMC has been

prohibited from rebuilding, faced with costs of construction that are millions of dollars in excess of what Liberty Mutual has agreed to pay. It can hardly be argued with any sense of equity that APMC was required to rebuild in the absence of a financial commitment from Liberty Mutual. Such would be a fool's task, especially in light of the sheer magnitude of the competing estimates.

I should also point out that there is good law that an insured is entitled to replacement cost benefits withheld under an insurance policy, where the carrier has interfered with its ability to recoup the same. *See, e.g.*, Rockford Mutual Insurance Co. v. Pirtle, 911 N.E.2d 60 (Ind. App. 2009) (insured entitled to recover replacement cost coverage even when he does not rebuild, where the carrier's underpayment of the claim interferes with the rebuilding process); see also, *Couch on Insurance* (3rd ed. 1995) §176:59 at 176-52. As the argument goes, where the carrier interferes with the insured's ability to timely rebuild through bad faith misconduct, the insured is free to seek as damages, replacement cost benefits paid for and available under the insurance policy.

While it is not APMC's immediate intention to litigate the issues addressed in this correspondence, it must have some relief from the two-year rebuilding deadline to stave off that type of confrontation. We propose entering into a form of tolling agreement, allowing APMC one year to rebuild upon reaching an agreement as to the value of the building facilities claim. This would thus preserve APMC's ability to recoup any withheld depreciation in a fair and reasonable manner, consistent with the adjusting history that has unfolded over the past two years.

I suggest sharing this letter with Liberty Mutual's legal counsel so that we can immediately commence a dialogue to satisfy these concerns and potentially avoid litigating these and other issues. This is a time-sensitive demand for action. Liberty Mutual must appropriately respond to these concerns *no later than the close of business May 19, 2017*, in order to avoid APMC filing a claim against the carrier in Superior Court.

Thank you for your attention to this correspondence.

Regards,

Robert D. Ryan

cc:  APMC (Jim Long)
     Josh Scott

RDR/dc